I'm not sure if it's still O'Malley. Thank you. Thank you. All right. Mr. Anderson, good morning. Good morning, Your Honor. You have reserved three minutes for rebuttal. Is that right? I believe I did. Yes. Okay. That's fine. So that gives you seven to start. And good morning. My name is Arthur Anderson. I represent April Bechard. And this is a social security disability case. Ms. Bechard's disability is based on a spinal disorder. The spinal disorder is what's called a listed impairment in the social security parlance. And if she meets the requirements of the listed impairment, which is 1.04, then she's presumed to be disabled. This case also does not begin on the date that the ALJ said was the onset date of October 30, 2010. That is an artificial onset date created only by the fact that Ms. Bechard had a previous period of disability starting in 2004, 2005. But there is a finding that – or there is a determination that in the immediately preceding period she was not disabled. And that decision is not being challenged. So I understand that it's not technically an onset date because you're saying it's a continuation of something that existed before. But don't we have a finding that she was not disabled for some period before this period? Well, we have a finding based on evidence from Dr. Tran, her surgeon, in March 2009 that his second surgery was a success and that he had at that time released her to pursue oral activities. This initial optimistic view proved not to be – No, no, but just to clarify. I mean, I think – and ALJ said she was not disabled from March 11, 2010 through October 29, 2010. But this application involves the period October 30, 2010 to March 31, 2015, right? Well, as I said, that date is only based on ALJ Farrell's – the date of ALJ Farrell's decision. It's not based on any medical records between March 2010, I guess it was, and October 2010 when Dr. Tranmer, in May 2010, reviewed her situation, wanted to avoid fusion surgery. If he contemplated fusion surgery, that shows that she still had significant spinal disorder problems and that his opinion, his initial optimistic opinion, was not correct. After that, Dr. Tranmer sent her on a series of epidural injections that she underwent. And as of this time, as of the artificial date, she had gone through two unsuccessful surgeries. She's had MRI evidence of significant back problems. She had a number – a series of epidural injections. And she's had to drive all the way from Shazy, New York, around the lake or across the ferry to Burlington for miles. Yeah, but there's no denial that she has limitations, right? The ALJ here said that she has physical limitations and is only capable of light. Well, that's really not saying she has any limitations. Of course, the ALJ's own medical expert, Dr. Gustaf, said that she was limited to less than sedentary work. Even Judge Farrell said that she was limited to lifting 10 pounds and sitting periodically, several times a day, 10 to 30 minutes. That's after medical improvement, and that's at the time that Dr. Tranmer – yes, at the time that Dr. Tranmer had been optimistic that her medical problems, her spinal disorder, was resolved. This did not occur. Oh, no. I mean the ALJ goes through all the exhibits to Dr. Gustaf's opinion and decides that it doesn't justify the total physical limitation, right? Well, the issue is whether Dr. Gustaf, as the ALJ's medical expert, and there's no other medical opinion in the record that challenges Dr. Gustaf's medical equivalency opinion. But the determination as to whether somebody is disabled is a decision for the commissioner, right? The medical experts can opine on the underlying medical conditions, but whether that amounts to a disability is something that the agency is supposed to determine. Well, those are two different separate questions. The initial question is that whether the ALJ was justified in rejecting his own expert's opinion without any supporting – Well, that's right. I mean I understand. So he has to – there has to be substantial evidence supporting the decision of the ALJ. That's right. And there isn't any. Well, I mean the ALJ does point to some reports that show that Bouchard had normal gait and reflexes and strengthened her extremities, that she performed child care and some exercise, right? Doesn't that not exist in the record? The standard, though, when an ALJ rejects a medical opinion, especially on a medical equivalency medical opinion, the standard this court has had for years is that that evidence has to be overwhelmingly convincing. The fact that the – And are you talking about the treating physician rule? I mean Gustaf is not a treating physician, right? Treating physician – Wagner doesn't say this only applies to a treating physician. Wagner says that for an ALJ to reject a medical opinion of a medical professional does not – he does not – it does not limit it to a treating physician. And why should it? Especially in a case like this where the ALJ is rejecting his own medical expert's opinion without – But Wagner is confined to treating physicians. You're disputing that? I believe that from the quotes that I have that – Well, I mean our case law, I mean, I think has come out pretty clearly since Wagner to say, no, no, Wagner is limited to treating physicians. But in any event, the treating physician rule is rescinded. And this examination and this determination is after the change in the rule, right? Well, the case was filed before the change in the rule. But it doesn't matter because we don't have a report from a treating physician, right? Well, it's still – the issue still is whether there was substantial evidence to support the ALJ's – But it's not – the ALJ doesn't provide overwhelmingly compelling evidence to the contrary. The ALJ, I mean, just has to have a substantial basis to make a decision, right? I disagree with that, Your Honor. I believe that the ALJ, in order to reject a medical opinion without any competing medical opinions, the ALJs can resolve differences in medical opinions. Well, if the ALJ sees that the opinion of Dr. Gussoff is contradicted by notes and exhibits that are attached to Gussoff's report, the ALJ could do that. He would agree, no? I don't think that the ALJ has the expertise to use its own view of medical evidence to challenge a medical expert's or a medical personnel's medical opinion, especially on the issue of medical equivalency. That the – Then why do you have these adjudications by ALJs? I mean, isn't that the whole purpose of having this adjudication? The purpose of the adjudication is for the ALJ to apply the medical opinions of doctors and – So the doctors explain the physical limitations and their diagnoses, but the question about whether that amounts to a disability under the Social Security Act, that is to be decided by the commissioner, right? Well, yes, but the ALJ can't simply reject all of the favorable evidence that is presented. And in this case, because it's the medical expert of the ALJ – But if the ALJ determines that the evidence, in fact, contradicts what the doctor's opinion is, the very exhibits the doctor attaches, why can't the ALJ discount that opinion because it's not supported by evidence? In this case – That's the ALJ's job. In this case, the ALJ did not point to substantial evidence to support his decision to reject the only medical opinion in the record that found medical equivalency. He did not point to any evidence that Ms. Bechart did not have radiculopathy throughout the whole period of time, that she did not have refractory pain, which Dr. Gustafs felt was one of the characteristics of the – of the listening, or that she did not have any of the other – she did not have – Don't Dr. Wassef and Roa think that she has normal gait and motor activity in her extremities and normal sensory responses and moderate rotary movement in the lumbar spine? Well, they did, but she also – they also said – Dr. Wassef said that she had diffuse tenderness in her spine and on a later date he found that she was limited in most activities to – up to – she was markedly limited in most activities. Dr. Roa – Isn't the – isn't the residual functional capacity finding consistent with that, that she's pretty limited but she could be an office assistant and perform light work? Well, those are questions that need vocational – that – I would just point out that the fact that the judge pointed to – she did some exercises in 2012 or 13 that – what's – what that demonstrates is she was on a treadmill. She was walking a little too much. If she hurt her back walking on the treadmill a little too much, that's strong proof that she would not be able to do six hours of walking and standing in an eight-hour workday that the ALJ – Right. Well, the residual – the residual functional capacity finding says she could – she has to move every 30 minutes. It says – Well, there's no support for that. Except that she could occasionally climb ramps or stairs, bounce, stoop, kneel, crouch, or crawl, but never climb ladders, ropes, or scaffolds. She could occasionally perform bilateral foot control operations. She required the ability to alternate position every 30 minutes for one to two minutes at a time while staying on task. Due to pain, she was limited to simple routine tasks. Right? So that is pretty limited, but it is some capacity. There's no medical evidence that supports that. The judge just made that up out of pure fluorescence. I think you have to agree with me that there are – there were doctors who thought that she had normal gait and reflexes. Yeah. They also found that she had radiculopathy, and they also found that she needed additional medical treatment and attention. And Dr. Tremmer still indicated that she may need fusion surgery. Those are the strong indications. And every time that she went to see a doctor, she always had pain. She always had physical, clinical evidence of abnormalities. She's had MRI, X-ray evidence of abnormalities throughout the whole period. What the ALJ should have done, because there was only one medical opinion, and that was his own medical expert's opinion, he should have developed a record. He should have sent him more interrogatories or asked him to appear at the hearing to explain some of these things. It's a pretty long ALJ opinion. I mean, it's longer than the average one, right? Like he did develop a pretty extensive record. That provision about getting clarification from a medical source is if there's an ambiguity or something missing from it, right? But the ALJ here said, okay, he laid out his opinion. I just disagree with one of the conclusions. So it's not really like an omission from the record, right? The ALJ primarily based his rejection on Dr. Gussoff's opinion, on the fact that Dr. Gussoff referred to a 2004 MRI and her previous unsuccessful surgeries. That's what he said. We have three ALJ decisions here. So the fact that he did not consider the earlier period should have resulted in his asking Dr. Gussoff, either by additional interrogatories or having him appear, what supports his decision? If it's a little arcane for me or cryptic and I can't really understand it, the Social Security Act is remedial. It's inquisitorial, not adversarial. And the Supreme Court has said that it's the ALJ's duty to develop the record, to show both sides, both the good, the bad, and the ugly, and to develop the record. The judge did not develop the record. Did not develop the record with respect to any lack of medical treatment that he found that she had. He didn't develop the record to consider that maybe, you know, after all these unsuccessful back surgeries and procedures, and driving over an hour for medical attention without any significant relief, that it was too much. So we're way over, Mr. Anderson. So you've got three minutes for rebuttal, but I want to hear from Ms. Carter. Thank you, Your Honor. No, that's all right. Thank you. Ms. Carter. Good morning, Your Honors. May it please the Court, Molly Carter for the Acting Commissioner. This Court should affirm the Commissioner's decision because substantial evidence supports the ALJ's findings that between October of 2010 and March of 2015, Ms. Bichard was not per se disabled under a listing, and she retained the capacity for light work with limited postural activities and the ability to change positions every 30 minutes. Although Dr. Gusoff opined that Ms. Bichard's impairments either satisfied a listing. I'm sorry. I'm going to ask you if you just move the mics a little closer to you so we can hear you. Apologies, Your Honor. You can raise the podium if you want as well. Thank you, Your Honor. Apologies. Although Dr. Gusoff opined that Ms. Bichard's impairments either satisfied a listing or caused further functional limitations, the ALJ reasonably could not square those opinions with the evidence in the record during the period at issue. I want to highlight that at the most recent hearing in 2020, the plaintiff's representative confirmed at page 1072 that the alleged onset date in this case is October 30, 2010. So the period at issue spans four years and five months. But you don't disagree that it's somewhat artificial because there was a prior disability and then there was a finding about a non-disabled period. Right. So like you can look at whether a pre-existing condition kind of flared up. Certainly. Certainly, Your Honor. But that decision that she was not disabled from March of 2010 through the date has not been challenged. Correct. Thank you. So the period at issue does span four years and five months. And Ms. Bichard did not receive treatment for her back impairment over more than three of those years. There was no treatment for her back impairment between September of 2011 and December of 2012 or after February of 2013. And when she alleged disability, she had been released to normal activity without restriction by her treating surgeon and her providers were encouraging her to exercise. And she later reported exercising regularly, including walking and using the treadmill. The ALJ reasonably found- So we have this idea about conservative treatment and so on. But if a doctor says that there might be some more drastic surgery but I'm trying to avoid it or maybe I don't think it's worth it, there's not a lot more to do, that could be consistent with being disabled, right? That's not what happened here, Your Honor. When Ms. Bichard was receiving treatment from Dr. Pino, which was in late 2010, early 2011, and then from Dr. Rao in early 2013, both of those sources suggested further injections. Dr. Rao suggested, I think it was medial branch blocks, and Ms. Bichard said she wanted to think about it, never returned and didn't receive any treatment for the two years remaining in the relevant period. So it's true if it was said there's nothing more we can do, that would be one thing, but that's just not what happened here. Moreover, she was treating- And Mr. Anderson said, you know, the idea that she was doing exercise and then sustained an injury just from walking on the treadmill might also indicate disability. What do you think about that? There's no indication that she sustained an injury simply from walking on the treadmill. What she said was that she returned, she was attributing increased symptoms to the fact that she had been doing a lot of exercise in an attempt to lose weight. She had given birth during the period where she wasn't treating for her back impairment. She had given birth, I believe, seven or eight months earlier, and she said, I've been doing a lot of exercise and trying to lose this weight after I was pregnant, and I think that's what flared up. And again, she saw Dr. Rao twice in January and February of 2013 and then didn't return to any sort of treatment for the remainder of the relevant period. So again, the idea that simply walking was causing her disability simply isn't borne out by this record. Would you say it's unusual for the ALJ to overrule the expert that the ALJ hired for this process? This is not a treating physician, this is not somebody with a relationship with the patient. It's not an- I can't speak statistically, but certainly it's not unusual on the facts of this case. Although the ALJ, the Social Security Administration, did hire this expert, it's an impartial expert, so to say that this was someone that the ALJ hired to find her not disabled or anything like that would be incorrect. This is an impartial medical expert, and particularly on the question of medical equivalents, Social Security ruling 17-2P, which is cited extensively in our brief, makes clear that the ALJ is still supposed to evaluate the opinion pursuant to the regulations. And so that's exactly what the ALJ did here. The ALJ very carefully went through each of the four exhibits that Dr. Gusoff cited. He was asked what evidence supports your conclusion that medical equivalents- Although he cited- I mean, he scribbled numbers, and the ALJ assumed he was referring to Exhibits 21F and 28F. I mean, the quality of the opinion is questionable for sure, which is part of your argument, but it is your client's expert. So I wonder to what extent they conduct- I mean, that's a different issue than to resolve this particular case. But it is troubling that the agency's own expert produces a report of this quality or lack thereof, isn't it? No, Your Honor. This is an independent, impartial expert. It's not the agency's expert. This isn't an employee of the Social Security Administration. Presumably the agency- but it's under contract, right? He's paid by the agency to- he's an independent physician, but he's paid by the agency, presumably to perform a thorough evaluation. And he was asked what supports your opinion, and the only thing he said was these four exhibits, none of which, as the ALJ explained, actually supported his conclusion. Moreover, that wasn't the only thing the ALJ- cited the ALJ on his own, as he's required to do is base each finding on the record as a whole. The ALJ went through and said that opinion was inconsistent with the treatment history and the evidence that's there. No, I understand that. My question's not antagonistic. It may be perceived that way, but it is troubling that the agency's own expert performs this type of evaluation. You can understand how someone seeking benefits might be concerned that they're sent to the opposing party's expert, if you will, for lack of a better word, and that person supports their position, and then it's rejected by the agency. I understand your position, why it was rejected by the agency, but I have a question on that. If we were to agree with the ALJ's assessment of Dr. Gussoff's- rejection of Dr. Gussoff's opinion, and that Ms. Bouchard's conditions did not meet or equal the listed impairments under the regulations, do we need to reach step four that the ALJ reached as to her residual functional capacity? If your Honor agrees that she did not satisfy a listing, then yes, the sequential evaluation process continues. The process stops at step three if an individual is found disabled at step three, which is the listing step. So for the court's purposes, generally you don't see cases that stop at step three because that's an individual who's disabled, and so the next question would be the second issue that has been raised, which is since she didn't establish that she satisfied a listing, her RFC and the ALJ did also reasonably find that she remained able to do a reduced range of light work with the ability to change positions every 30 minutes. In addition to giving significant weight to Dr. Tranmer's opinion that Ms. Bouchard should resume all activities of daily living, incorporate regular exercise, and have no restrictions, the ALJ then acknowledged that the imaging and examination evidence in the record did support impairment in the lumbar spine. So isn't it weird to give significant weight to his opinion if it turned out not to be correct? Not in the context of this case, Your Honor. This case was decided because of the application date under the old regulations, so the language is in terms of weight, and it wasn't the most weight or the great weight. The ALJ also gave significant weight to Dr. Wasseff's opinion in 2014 to the extent that he opined as to moderate limitations, which I believe, as Your Honor suggested, is ultimately consistent with what was found. The ALJ agreed. I get it. So maybe it doesn't make the biggest difference, but isn't it weird to give significant weight to Tranmer's opinion that she should resume or could resume daily activities without restriction when it turns out that that's not really supported by the rest of the evidence? It's possible that better language would have been slightly more accurate for what happened, but I think any difference is… What's the language that would more accurately describe what happened besides significant weight to that opinion? It could have been little weight, as with the other opinions. Oh, that would have been different determination, right? That would have been different. I mean, that would be the… There's no suggestion that the ALJ was relying. Even though he said significant weight, you think he didn't really accord it that much weight in the determination? Yes, yes. And it's clear from the record as a whole that that is not what happened. I do want to just, I see my time has expired, point out again that the ALJ relied on evidence throughout the record, including Ms. Bichard's own reports that standing or walking for long periods were one of the things that worsened her impairment. She reported at times that she actually needed to stand or walk, for example, at 356 and 763, and she reported, again, that she was walking and using the treadmill. If your honors have no further questions, we ask that you affirm. All right. Thank you very much, Ms. Carter. We'll now hear from Mr. Anderson for three minutes of rebuttal. All right. I would just like to restate that, as Judge Kahn raised, the quality of Dr. Gusoff's opinion was at least troubling, as you said. But you're trying to say that Gusoff's opinion should be dispositive. I'm sorry? Your position is Gusoff's opinion should be dispositive, right? Well, it should be because he… The quality of it is troubling, but it should be controlling is the outcome of this case? Well, because he identified in his – if it was a short area that he responded to, that was basically because of the area that the agency gave him to insert this information. Dr. Gusoff identified laminectomies, identified nerve root compression, identified… So now you're saying that actually it was a high-quality opinion. So why did you just say that the quality of it was troubling? Well, I don't want to quibble with whether it was high-quality or low-quality of his opinion. His opinion is what it was, and the actual opinion itself, the way it was presented, probably did present some ambiguities. Well, it's not like what you're saying really, Mr. Anderson, is that the ALJ should have deferred to Dr. Gusoff, but if the ALJ wasn't going to defer to Dr. Gusoff, then the ALJ had an obligation to expand the record by going to somebody else or to get further clarification from Gusoff. That's correct. I guess that's what you're saying. That's exactly correct. He should not have left the record the way it was with the ability to… And that would suggest that at any time the record is not sufficient to support disability, that there's an obligation to expand the record. I mean, in other words, there were items that were attached to Dr. Gusoff's report, and that's what the ALJ focused on and said they contradict that finding and support a conclusion that actually your client doesn't meet the listing, the criteria for the listing. Why isn't that just sufficient? I'm not really sure if I understood the question, but in this case… What is it that triggers an obligation to expand the record? The fact that the ALJ rejected his own medical expert's opinion. So under that view, then, any time the ALJ rejects the opinion of the agency-appointed expert, there's an obligation to expand the record? I'm not saying categorically that's the issue, but in this case that's the only medical opinion in the record, and the issue of medical equivalency requires a medical opinion, and there is no medical opinion in the record. What I'm saying is the only medical opinion in the record, even though we have all of these other opinions of doctors, it's because it's the only one that directly addressed the medical equivalency issue, you're saying? Well, yes, that's the only one that's addressed… But you agreed with me a moment ago that the medical equivalency determination as to whether somebody is disabled is a decision for the commissioner. We rely on medical opinions for the underlying details of the medical condition of the diagnosis, right? My position is the ALJ cannot base a finding, especially a sophisticated medical finding of medical equivalency, on no medical opinion at all, and only on his own review of certain – picking out, cherry-picking some of the items from… You're saying there has to be a doctor somewhere that says this person is disabled in order for there to be a finding of disability? I say that a doctor in this case has to say that medical equivalency either is or is not… So you're saying a doctor has to opine on the issue of medical equivalency? Yes, that's what the commissioner's regulation says, what the case law says. The case law says – well, the case law says the underlying evidence is based on medical evidence, right? But the idea of whether somebody is disabled and the medical equivalency is a finding of disability, that's a determination of the commissioner, right? Well, if there's a finding of medical equivalency, then the commissioner presumes disability. So the important issue is whether there's medical equivalency, and without a medical opinion on medical equivalency, the record is not complete. It does not support the ALJ's decision, and the ALJ should have asked for clarification or, as Judge Sullivan said, asked for another opinion, and this is because it's the medical expert of the ALJ, and we had no ability to get that information from Dr. Gusoff ourselves. We can't contact the ALJ's medical expert and say, please give us some more information. So we have – just in the interest of time, I think we've gone over – we certainly have your arguments, and I think we have a full understanding of that argument, Mr. Anderson. So I'm going to move on to the next case, but I want to thank you. Thank you, Your Honor. And also thank Ms. Carter. We will reserve decision.